## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

TOMMY RAY LOPEZ,

      Plaintiff,

v.                                   No. Civ. 10-1197 LH/GBW

FREEPORT-MCMORAN TYRONE, INC., and
FREEPORT-MCMORAN TYRONE MINING, LLC,

      Defendants.

### MEMORANDUM OPINION AND ORDER

On August 19, 2011, Defendants filed a Motion for Summary Judgment (Doc. 49) and Memorandum in Support (Doc. 50). The Court, having considered the motion, briefs, evidence, arguments, relevant law, and otherwise being fully advised, finds that the motion should be **granted** and that Plaintiff's claim should be **dismissed**.

## I.    FACTUAL BACKGROUND[1]

Freeport-McMoRan Tyrone, Inc. and Freeport-McMoRan Tyrone Mining, LLC ("Defendants"), operate a copper mine at their Tyrone facility near Silver City, New Mexico. (Def.'s Mot. for Summ. J. (Doc. 50) ("Def.'s MSJ"), at 2.) Plaintiff Tommy Ray Lopez ("Plaintiff") was employed by Defendants and their predecessor, Phelps Dodge, from 1976 until 2008. (*Id.* at Undisputed Fact ("UF") at ¶ 1.) In 1999, Plaintiff was promoted to a journeyman electrician position at the Tyrone Mine, and in August 2007, he was promoted to electrical supervisor and remained at that position until his termination on May 5, 2008. (*Id.*)

Plaintiff was considered by Defendants' general manager, Richard Mohr, to be a good

---

[1]The following facts are undisputed or, if disputed with admissible evidence, are construed in the light most favorable to Plaintiff, the non-moving party for purposes of Defendants' summary judgment motion.

employee.  (Pl.'s Resp., Ex. D, at 11:8-10.)   As  part of his job, Plaintiff received training for repairing electric shovels, which included two weeks of training provided by the manufacturer of the shovels.  (*Id*. at ¶ 2.)  Additionally, written training materials were available to Plaintiff.  (*Id*.)  Plaintiff was considered one of the most knowledgeable employees at the Tyrone Mine concerning shovel electrical repairs.  (*Id*.)

Defendants emphasized safety by holding safety meetings.  (*Id*. at ¶ 3.) Defendants also had several safety rules referred to as "Zero Tolerance Rules," including the companies' "Lockout Tagout Tryout" ("LOTOTO") policy.  (Def.'s MSJ, Ex. C & UF ¶ 4.)  Plaintiff testified that he received some form of a LOTOTO policy from Defendants.[2]  (Pl.'s Resp., Ex. A, at 47:4-10.)  Defendants' LOTOTO policy provided procedures to be used for isolating, locking out, and trying out a piece of equipment or machinery and controlling the unexpected release of energy.  (Def.'s MSJ, Ex. A.)  The policy required, in part, that employees who were performing repairs on equipment place their personal locks and lockout identification tags on the energy isolation device for the equipment.  (*Id*.)  Plaintiff testified that, under the LOTOTO policy, employees at the mine could not perform work on the electrical components of a shovel until they had verified that the energy had been isolated.  (Def.'s MSJ, UF ¶ 6.)

Upon  violation  of  a  Zero  Tolerance  rule,  such  as  the  LOTOTO  policy,  Defendants'

---

[2] Although Plaintiff testified that he received a LOTOTO policy from Defendants, he also testified that it was not in the precise format as the written policy, dated February 2008, that was presented to him by defense counsel at his deposition.  (Pl.'s Resp., 47:4-10.)  According to the testimony of Kelly Gomez, an electrician employed by Defendants, the particular LOTOTO policy presented by Defendants at his deposition was not actually adopted by Defendants until sometime after Plaintiff's termination, albeit dated February 2008.  (Pl.'s Resp., at 10.)  The Court concludes, however, that the particular format of the policy that had been adopted by Defendants at the time of Plaintiff's alleged safety violation is not material.  Rather, it is Plaintiff's awareness of the particulars of the LOTOTO policy that is significant to the Court's analysis.  Again, Plaintiff testified as to his awareness of the LOTOTO policy and to having received that policy, apparently in some written form.  There is no evidence suggesting that the LOTOTO policy of which Plaintiff was aware at the time differed in any significant way from the policy dated February 2008.  Indeed, Plaintiff's deposition testimony with regard to Defendants' LOTOTO policy suggests intimate familiarity with the specifics of Defendants' policy.  (*See, e.g.*, Pl.'s Resp., Ex. A, at 47-51.)

procedure was to 1) investigate, considering mitigating circumstances; 2) engage in a management review process; and 3) make a decision concerning the proper resolution.  (*Id.*)   Not all employees who violated Zero Tolerance policies were terminated, but they could be terminated for such a violation.  (Plaintiff's Response (Doc. 55) ("Pl.'s Resp."), at 10.)   Plaintiff testified that his understanding of Defendants' Zero Tolerance LOTOTO policy was that it "applie[d] to everyone." (*Id.*)

Plaintiff also understood that as a supervisor he was responsible for ensuring that the people he supervised worked in a safe manner.  (Def.'s MSJ, UF ¶ 5.)  Similarly, he understood that it was his responsibility to hold his subordinates accountable for safe practices.  (*Id.*)

On April 29, 2008, Plaintiff was called back to the Tyrone mine because an electric power shovel, which had been down for most of the day, was needed to move ore.  (Def.'s MSJ, UF ¶ 7.) Plaintiff returned to the mine, and two other electricians, Bill Barrington and Shawn Wells, were already working on the shovel.  (Pl.'s Resp., Relevant Fact ("RF") ¶ 3.)  Plaintiff asked Mr. Barrington and Mr. Wells some questions about the problems with the shovel and requested the blueprints so that he could begin troubleshooting.  (*Id.* at RF ¶ 4.)  Plaintiff went through various processes to diagnose the problem with the shovel and, after about two hours, he determined that the problem was a fault in the main transformer contractor ("MTC") cabinet and, more specifically, that a control fuse needed to be replaced.  (Def.'s MSJ, UF ¶ 8.); (Pl.'s Resp., RF ¶ 4.)

The MTC cabinet had originally been manufactured with a mechanism, called a Kirk Key system, which prevented the cabinet from being opened while electricity was connected.  (Pl.'s Resp., at 9-10.)  However, on April 29, 2008, the Kirk key mechanism was broken and had been broken for a quite a while.  (*Id.*)  Plaintiff knew that the Kirk key mechanism was not operational, and he also knew that, in accordance with Defendants' LOTOTO policy, employees were not

supposed to be in the MTC cabinet when power was being supplied to the cabinet.  (Def.'s MSJ, UF ¶ 9) (Pl's Resp., Ex. A, at 128-29.)  Furthermore, Plaintiff knew that, during the course of the repair work that day, but before Mr. Barrington was injured, Mr. Wells had committed a safety violation by reaching into the MTC cabinet to remove the blown fuse without opening the proper switches to de-energize the cabinet.  (*Id*. ¶ 10.)

Plaintiff, as a supervisor with considerable experience working with the power shovels, would have known that the shovel and MTC needed to be de-energized before work was done on them.  (Def.'s MSJ, UF ¶ 19.)  Plaintiff does not dispute that it would have been possible to lock the MTC cabinet doors with a padlock.  (*Id*. ¶ 13.)  Each employee had personal locks, and Plaintiff had three that were issued to him by Defendants.  (*Id*. ¶ 14.)  According to Plaintiff, the purpose of putting a lock on energy control devices was generally to prevent others from throwing the switch and energizing an area while employees were working on it.  (*Id*.)

After Mr. Wells removed the blown fuse from the MTC cabinet, the switches were opened and power was disconnected so that the electricians could replace the fuse.  (*Id*. at 90:20-25.)  The shovel then ran for a period of time and ceased operating.  (*Id*. at 90:24-25; 91:1-4.)  Plaintiff determined that the entire MTC needed to be replaced, which the electricians did, after opening the switches to disconnect power to the MTC.  (*Id*. at 93:12-19.)  After replacing the MTC, the switches were closed in order to restore power, and the shovel was tested again.  (*Id*. at 94:6-13.)  However, the shovel once again ceased operating, (*id*.), and Plaintiff, who was in the nearby control room reviewing schematics, indicated that the MTC fuse "blew again." (*Id*. at 94:10-15, 24-25.)  Plaintiff was in the process of starting to turn the power off at the control cabinet when Mr. Barrington reached into the still-energized MTC cabinet, pulled out the fuse, dropped the fuse, and inadvertently contacted the current transformer with his hand.  (*Id*. at 94: 16-18; 95:10-14.)  When

4

Mr. Barrington's hand came into contact with the transformer, Plaintiff perceived a flash, which may have been the lights switching to emergency power.  (Pl.'s Resp., RF ¶ 9.)  Plaintiff ran over to the shovel, jumping over some tools, and opened one or more switches to disconnect the power and to attempt to help Mr. Barrington.  (*Id.*)  Mr. Barrington was escorted out by ambulance.  (*Id.*)

At the time that Mr. Barrington came into contact with the current transformer, Plaintiff was aware that power was being supplied to the MTC cabinet, (Def.'s MSJ, UF ¶ 10); however, he testified that he did not direct or anticipate that Mr. Barrington would reach into the cabinet while power was still being supplied to it, (Pl.'s Resp., RF ¶ 8).

The day after Mr. Barrington was injured, Edwin Bradberry, mine maintenance superintendent and Plaintiff's direct supervisor, asked Plaintiff to make a statement about what happened.  (*Id.* ¶ 10.)  He then placed Plaintiff on leave and directed Thomas Palmer, senior supervisor, to investigate the incident.  (*Id.*)  After the investigation, the decision-makers unanimously determined that Plaintiff had either violated the LOTOTO safety rule himself, by failing to isolate the energy source, or had allowed such a safety rule to be violated under his supervision.[3]  (Def.'s MSJ, UF ¶ 18.)  Plaintiff was therefore terminated.   Plaintiff's duties were assumed by a Caucasian employee, Michael Short. (Pl.'s Resp., at 9.)

Plaintiff's termination letter states that Defendants investigated and "concluded that [he] did violate the Zero Tolerance Safety Rule of not following the Lock-out/Tag-out/Try-out procedures." (Def.'s MSJ, Ex. F.)  Defendants' LOTOTO policy was a "determining factor of [Plaintiff's]

---

[3] Both Edwin Bradberry, the mine maintenance superintendent and Plaintiff's direct supervisor, and Michael Zunich, the mining and reclamation manager, testified that Plaintiff violated the LOTOTO policy.  (*See* Pl.'s Resp., Ex. B, at 102:5-19; Ex. E, at 13-14.).  On the other hand, Thomas Palmer, Plaintiff's direct supervisor and the person who conducted the investigation, indicated that Plaintiff was terminated because he was the supervisor on the job when the LOTOTO policy was violated by Mr. Barrington.  (Pl.'s Resp., Ex. C, at 37:1-10; 47:1-5, 22-25; 48:1-5.)

termination"; however, the employees who made the decision to terminate Plaintiff did not collectively refer to or review any written policies during the course of discussions regarding Plaintiff's termination.  (Pl.'s Resp., Ex. B, at 41:22-25; 42:1-11; 43:1-9.)  Neither Mr. Barrington nor Mr. Wells, both Caucasian, were terminated as a result of safety violations that precipitated the April 29, 2008 accident.  (Def.'s MSJ, UF ¶ 21).  Both, however, received counseling with regard to LOTOTO procedures.  (*Id.*)

The Federal Mine Safety and Health Administration also investigated the April 29, 2008 accident and concluded that Mr. Barrington "did not lock the disconnect before trying to replace a 125 Volt fuse on the (MTC) main transformer contractor."  (Def.'s MSJ, Ex. G.)  Plaintiff concedes that the accident occurred because both he and Mr. Barrington failed to de-energize or disconnect the power source from the MTC cabinet.  (Def.'s MSJ, UF ¶ 17.)

The only other supervisor employed by Defendants in a similar position to the position that Plaintiff held was Johannes Larisch, who is Caucasian.  (Pl.'s Resp., at 9.)  A number of other employees of Defendants, both Caucasian and Hispanic, were involved in alleged violations of the companies' Zero Tolerance rules before and after the April 29, 2008 accident, including Randy DeVinney, Robert Milburn, Walter "Larry" Villines, and Becky Garcia.  (Pl.'s Resp., Ex. D, 61:7-20; 68:1-7); (Def.'s MSJ, Ex. L).

Randy DeVinney, a Caucasian supervisor at Tyrone, was demoted but not terminated for a violation of LOTOTO procedures.  (Def.'s MSJ, UF ¶ 22.)  Following an investigation, Defendants determined that there were extenuating circumstances that mitigated against Mr. DeVinney's termination.  (*Id.*)  Specifically, the investigation revealed that when a piece of equipment that was operating within a barricaded area had completed its part of the work, the barricades were taken down and the equipment was removed by others at the worksite.  (Def.'s MSJ, Ex. J, at 65:12-20.)

6

Then, while there were no barricades to define the LOTOTO work zone, Mr. DeVinney stepped inside of the area.  (*Id*. at 65:21-25; 66:1-4.)

Richard Mohr, the general manager of the Tyrone Mill, who participated in the decision to terminate Plaintiff, also recommended the termination of Robert Milburn, a Caucasian, for a LOTOTO policy violation at the Chino mine.[4]  (Def.'s MSJ, UF ¶ 23.)  Mr. Milburn was in fact terminated.  (*Id*.)

In April 2008, around the same time as the incident involving Plaintiff, Defendants disciplined but did not terminate Walter "Larry" Villines, a Hispanic supervisor, after an operator under his supervision moved a piece of equipment into an area that was about to be blasted with high explosives. (Def.'s MSJ, Ex. K & L.)  Defendants' investigation ultimately revealed that there was "no violation of one of [Defendants'] Zero Tolerance Rules against entering a restricted area because, at the time of the incident, the route taken by the operator had not been marked as restricted with yellow cones."  (Def.'s MSJ, Ex. L.)

Sometime after the April 29, 2008 accident, Rebecca Garcia, a Hispanic, was terminated for a LOTOTO violation that occurred while she was working on a pump.  (Defendant's Reply ("Def.'s Reply"), Ex. A.)  Ms. Garcia appealed her termination and filed a charge with the U.S. Equal Employment Opportunity Commission.  (*Id*.)  After further review, it was determined that there were mitigating circumstances in Ms. Garcia's case, and Defendants reversed the decision to terminate her. (*Id*.)

## II.    PROCEDURAL HISTORY AND PLAINTIFF'S CLAIM

---

[4] According to Defendants, the Chino mine is a separate corporate entity but a subsidiary of Freeport McMoRan Copper & Gold.  (Def.'s MSJ, at 19 n.6.)  Richard Mohr, General Manager at Tyrone, is Vice President over New Mexico Operations and is responsible for oversight of the Chino Mine.  (*Id*.)  The LOTOTO policy in question in this case apparently applies to operations at both Chino and Tyrone.  (*Id*.)

Plaintiff filed his Complaint in the Sixth Judicial District Court, County of Hidalgo on November 12, 2010. (Doc. 1, Ex. A.)  Thereafter, on December 15, 2010, Defendants removed the action to this Court based on diversity of jurisdiction. (Doc. 1.)  In his Complaint, Plaintiff asserts an action against Defendants for national origin discrimination in violation of the New Mexico Human Rights Act. (Doc. 1, Ex. A, ¶¶ 9, 10.)  Plaintiff seeks damages, including back pay and benefits, front pay and benefits, compensatory damages in the past and future, attorney's fees, pre-judgment and post-judgment interest, and court costs. (Doc. 1, Ex. A, ¶ 11.)

Plaintiff argues that he has presented evidence sufficient to establish a *prima facie* case of national origin discrimination, in that he has established that he was replaced by a non-Hispanic employee and, alternatively, that he was treated less favorably than similarly-situated non-Hispanic employees for his LOTOTO violation.  Moreover, Plaintiff contends that he has presented evidence creating a question of fact as to whether the justification offered by Defendants for his termination was pretextual – that is, evidence that Plaintiff did not in fact violate Defendants' LOTOTO policy.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).  Under Rule 56(c), the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, only disputes of facts that might affect the outcome of the case will properly

8

preclude the entry of summary judgment.  *Id.* at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists.  *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993).  Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial.  *Id.*  The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.*; *Kaus v. Standard Ins. Co.*, 985 F.Supp. 1277, 1281 (D. Kan. 1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *See Anderson*, 477 U.S. at 248.

## IV.  ANALYSIS

The New Mexico Human Rights Act ("NMHRA") tracks the language of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, making it unlawful for an employer to discriminate against an individual on the basis of his national origin.  NMSA 1978, § 28-1-7(A).  Recognizing that evidence of discrimination in most contexts will be indirect or circumstantial, New Mexico courts employ the three-stage analysis outlined by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) to claims under the NMHRA.  *Garcia-Montoya v. New Mexico State Treasurer's Office*, 2001-NMSC-003, 16 P.3d 1083, 1099.  Applying the McDonnell Douglas framework to the present case, Plaintiff must first establish a *prima facie* case of discrimination.  *See id.*  Then, if Plaintiff satisfies his *prima facie* requirements, the analysis moves to the second stage of the *McDonnell Douglas* framework, where the burden shifts to Defendants to present a legitimate, nondiscriminatory reason for its action.  *See id.*  Finally, if Defendants presents such a reason, the burden shifts once again to Plaintiff to establish that the proffered reason

9

for his termination was pretextual.  *See id.*

### A.  *Prima Facie* Case

New Mexico courts have noted that a *prima facie* case under the NMHRA may be established in various manners.  According the New Mexico Supreme Court in *Smith v. FDC Corp.*, 787 P.2d 433 (N.M. 1990):

> A prima face case of discrimination may be made out by showing that a plaintiff is a member of the protected group, that he was qualified to continue in his position, that his employment was terminated, and that his position was filled by someone not a member of the protected class.  A prima facie case may also be made out through other means; not all factual situations will fit into any one type of analysis, although unlawful discrimination may nevertheless be present.  For example, a prima facie case can be shown absent a demonstration that the plaintiff was replaced by someone not in the protected class if he can show that he was dismissed purportedly for misconduct nearly identical to that engaged in by one outside of the protected class who was nonetheless retained.

*Id.* at 437 (internal citations omitted).

It is uncontested that Plaintiff has met the first three elements of his *prima facie* discrimination case, for he is Hispanic, was qualified to serve as an electrical supervisor, and was terminated by Defendants.  According the New Mexico Supreme Court's analysis in *Smith*, then, either evidence that Plaintiff was replaced by a non-Hispanic after termination *or* evidence that a similarly-situated non-Hispanic employee engaged in the same behavior but was *not* terminated would satisfy Plaintiff's *prima facie* burden under the NMHRA.  *See Smith*, 787 P.2d at 437. Plaintiff attempts to provide evidence of both.

First, Plaintiff presents evidence, in the form of interrogatory responses from Defendants, indicating that after his termination Plaintiff's job duties were assumed by Michael Short, a Caucasian.  Significantly, because Plaintiff satisfies his *prima facie* case with such evidence, the Court need not address the alternative manner of establishing a prima facie case – through evidence

of preferential treatment of similarly-situated non-Hispanics.[5]

## B. Legitimate, Non-discriminatory Reason for Termination

Next, the Court's analysis moves to the second stage of the *McDonnell Douglas* framework, where the burden shifts to Defendants to present a legitimate, nondiscriminatory reason for its action against Plaintiff. *Garcia-Montoya*, 16 P.3d at 1099. At this stage, Defendants need not litigate the merits of the reasoning for Plaintiff's termination; nor do they even need to prove that the reason relied upon was "bona fide." *See EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992). Rather, an employer's burden is merely to demonstrate a legitimate, nondiscriminatory reason for Plaintiff's termination.

The Court is satisfied that Defendant has rebutted Plaintiff's *prima facie* case through the presentation of a legitimate, nondiscriminatory reason for his termination. In the Court's view, the violation of a Zero Tolerance safety policy, which at minimum occurred under Plaintiff's supervision, was a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Brown v. ConAgra Food Ingredients Co.*, No. 07-01108, 2008 WL 5101731, at *23 (D. Colo. Dec. 1, 2008) (granting summary judgment for the defendant where the termination of the plaintiff was based on his violation of the defendant's "lockout/tagout" policy); *Cordova v. PNM Electric & Gas Serv*., 72 Fed. Appx. 789, 792 (10th Cir. 2003) (upholding the district court's grant of summary judgment in favor of the defendant where it presented evidence that the plaintiff posed a safety hazard); *Sanchez v. Home Depot, Inc.*, No. 03-999, at 5-7 (D.N.M. Aug. 17, 2004) (granting summary judgment for

---

[5] Defendants simply dismiss the evidence presented by Plaintiff that he was replaced by a non-Hispanic, arguing that Plaintiff fails to establish a *prima facie* case "because he cannot show that Defendants treated him differently than similarly situated, non-Hispanic, employees." (Def.'s Reply, at 7.) However, *Smith v. FDC Corp.* makes clear that a plaintiff's showing that he was replaced by a person outside of his protected class is an *alternative* to establishing that he was treated less favorably than a person outside of his protected class. *See Smith*, 787 P.2d at 437.

the defendant where the terminations of the plaintiffs were based on violations of safety regulations).

### C. Pretext

Given Defendant's presentation of a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts once again to Plaintiff to establish that the proffered reason for his termination – the violation of Defendants' LOTOTO policy – was pretextual.  Pretext can be shown where there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Riggs v. AirTran Airways, Inc*., 497 F.3d 1108, 1118 (10th Cir. 2007).

An employee may show that an employer's proffered reason is prextextual in a variety of ways, including the following: 1) by showing that the stated reason is false; 2) by showing that the employer acted contrary to a written company policy; or 3) by showing that the employer acted contrary to an unwritten company policy or practice.  *See Kendrick  v. Penske Transp. Serv., Inc*., 220 F.3d 1220, 1230 (10th Cir. 2000).  A plaintiff attempting to show that a company acted contrary to an unwritten company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.  *Id.*

In analyzing the evidence presented by Plaintiff, the Court must bear in mind that it is not to second-guess business decisions made by Defendants in the absence of some evidence of impermissible motives.  *Garrison v. Gambro, Inc.,* 428 F.3d 933, 938 (10th Cir. 2005).  Notably, the "relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."  *Rivera v. City & County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004).

Plaintiff's primary argument with regard to pretext is that the justification provided for his termination was false. A *prima facie* showing – that Plaintiff was qualified for his position, was terminated, and was replaced by a non-Hispanic employee – combined with evidence that Defendants' asserted justification was false would preclude summary judgment. *See Garcia-Montoya v*, 16 P.3d at 1101.

Plaintiff insists that Defendants' articulated reason for his termination is false, because, as he explains, he did not violate Defendants' LOTOTO policy in performing repairs on the electric shovel on April 29, 2008. According to Plaintiff, it was permissible for equipment to remain energized when a problem was being diagnosed or employees were troubleshooting, as the machine may need to be tested in order to determine the specific problem. Plaintiff asserts that, at the time of Mr. Barrington's injury, he was merely troubleshooting the shovel, and the isolation of energy was therefore unnecessary under the LOTOTO policy.

Defendants argue that whether or not Plaintiff was "troubleshooting" at the time of the accident is irrelevant, as is whether or not Plaintiff directed Mr. Barrington to access the energized cabinet. Defendants explain Plaintiff's LOTOTO violation as follows: 1) Plaintiff was supervising the repair work at the time of the accident; 2) he was therefore responsible for ensuring that his subordinates worked in a safe manner; 3) he failed to insist on proper safety procedures after observing an electrician reach into an energized high voltage cabinet; 4) he failed to take any precautions to ensure that his subordinates could not access the cabinet while energized; and 5) as a result of his failure to insist on proper safety procedures, one of his men reached into the energized cabinet and sustained a serious injury. (Def.'s Reply, at 2.)

While the evidence before the Court suggests that it was indeed acceptable to allow the shovel and related components to be energized during periods of troubleshooting, the failure of

13

Plaintiff and the other electricians to lock out the MTC cabinet and to refrain from opening and accessing the energized cabinet, and to prevent such action by others, *was* a violation of Defendants' LOTOTO policy.  Plaintiff readily admits that as the electrical supervisor, he was responsible for ensuring that the people he supervised worked in a safe manner. As the supervisor on the job when subordinate employees failed the follow LOTOTO procedures, it is reasonable for Plaintiff to share considerable responsibility for the violation, perhaps even to a greater degree than Mr. Barrington, who reached into the energized cabinet.  Accordingly, Plaintiff fails to establish a question of fact as to the falsity of Defendants' proffered justification for his termination.

Plaintiff argues that "discrepancies" as to whether, when and how Plaintiff violated the LOTOTO policy create fact issues allowing a reasonable trier of fact to find pretext.  Although the decision-makers have not articulated precisely the same view of Plaintiff's violation of the LOTOTO policy, there was agreement among them that he had either violated the policy himself, by failing to isolate the energy source, or allowed such a violation to occur under his supervision, such that  termination was proper.  Under the circumstances, the Court does not consider these "discrepancies" to be material or to suggest pretext.  Plaintiff was unquestionably terminated for a LOTOTO violation, be it one he committed himself or one for which he was responsible.  Either way, there is no suggestion in the evidence before the Court that the proffered justification for Plaintiff's termination was insincere or false.  Again, whether the decision to terminate Plaintiff for the LOTOTO violation was ultimately the correct decision is a question not before the Court.

Secondly, Plaintiff attempts to show that Defendants treated LOTOTO violations differently when they were committed by Caucasion employees rather than Hispanic employees.[6]  When an

---

[6] Plaintiff attempts to demonstrate that he was treated differently from similarly-situated non-Hispanic employees as an alternative method of demonstrating his *prima face* case.  (Def.'s Resp., at 15.)  Nevertheless, such evidence is equally applicable to the issue of pretext.  Therefore, the Court will consider this evidence in its analysis

employee attempts to show pretext by demonstrating that similarly-situated co-workers received more beneficial treatment, it is incumbent upon the employee to show that the comparators were similarly-situated in all material respects. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (citing *Kendrick* , 220 F.3d at 1230).  Among other things, they must generally show that the relevant co-workers were subject to the same policies, overseen by the same supervisors, and that their violations involved conduct of similar seriousness. *See Kendrick*, 220 F.3d at 1232. "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly-situated." *Id.*  Of course, not all differences in treatment by an employer constitute evidence of racial discrimination. *Id.*

In support of his assertion that Defendants disciplined similarly-situated non-Hispanic employees less severely, Plaintiff points primarily to the treatment of Mr. Barrington, the Caucasian electrician injured during the April 29, 2008 accident when he reached into the energized MTC cabinet.  Plaintiff notes that Mr. Barrington received very slight, if any, discipline compared to Plaintiff's termination, even though it was Mr. Barrington who reached into the energized cabinet. Defendants, on the other hand,  maintain that Mr. Barrington, as a subordinate to Plaintiff, was simply not similarly situated to Plaintiff.

The general rule is that employees may not be considered similarly-situated unless they share the same supervisor, *Rivera*, 365 F.3d  at 922, and, here, there is no question that Mr. Barrington and Plaintiff did not share the same supervisor.  However, some courts have held that when there is an enterprise-wide policy that is sufficiently specific, rather than broad and discretionary, disciplinary

---

of this third prong of the *McDonnell Douglas* framework.

actions taken by different supervisors may be compared to determine whether there is an inference of discrimination. *Id.* at 922-23; *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1177-78 (10th Cir. 2001).

Here, although the LOTOTO policy was enterprise-wide and was at least nominally a "Zero-Tolerance policy," there was, in practice, considerable discretion as to the type of discipline applied to a particular employee.  Indeed the  evidence suggests that the decision-makers who evaluated an alleged LOTOTO violation would evaluate the circumstances surrounding the alleged violation, considering any mitigating factors, before making a decision as to the appropriate discipline of the employee.  This discretion in determining disciplinary action weighs against considering Mr. Barrington and Plaintiff to be similarly-situated.  At the same time, however, it also appears that the same group of individuals who made a collective decision regarding the discipline of Plaintiff also made the decision as to the discipline of Mr. Barrington.  This fact cuts the other way, weighing in favor of treating Mr. Barrington and Plaintiff as similarly-situated individuals.  *See Rivera*, 365 F.3d at 923 (suggesting that discipline imposed by one supervisor against the plaintiff's co-worker should be considered because the same supervisor was involved in the investigation and recommendation of discipline with regard to the plaintiff's alleged misconduct).  The Court ultimately concludes, however, that Plaintiff's supervisory role counsels against treating Plaintiff and Mr. Barrington as similarly-situated employees.  Only Plaintiff had the added responsibility and expectation of ensuring that his subordinates operated in a safe manner and followed Defendants' safety rules.  Thus, only Plaintiff failed to meet Defendants' elevated safety expectations as they relate to supervisors.  *See Sanchez*, No. 03-999, at 5 (reasoning that evidence that an employee outside the protected class committed *different* safety infractions without the same discipline does not constitute evidence of pretext).  For these reasons, the Court concludes that evidence of disparate disciplinary

16

action against Mr. Barrington and Plaintiff is insufficient to raise a question of fact as to pretext.

Beyond discussing the minimal discipline received by Mr. Barrington, Plaintiff devotes little effort to providing evidence of non-Hispanic employees being treated more favorably by Defendants.  Indeed, it is primarily Defendants who discuss the discipline of Plaintiff's co-workers for Zero Tolerance safety violations.  *See Rivera v*, 365 F.3d at 912 (noting that the plaintiff's briefing on the issue of treatment of similarly-situated non-minority employees was "completely inadequate," because "[w]ith one exception, [Plaintiff] provide[d] no description of the conduct of other employees, how they were similarly situated or what discipline was imposed")  Plaintiff does mention, albeit only in his "Statement of Relevant Facts" and not in his analysis under the *McDonnell Douglas* framework, that another Caucasian employee of Defendants, Randy DeVinney, was found to have violated the LOTOTO policy but was not terminated.  Additionally, Plaintiff notes that a Hispanic employee, Becky Garcia, was terminated for an alleged LOTOTO violation.

With regard to Mr. DeVinney, the evidence before the Court, evidence primarily supplied by Defendants in their briefing, suggests that the circumstances involved in Mr. DeVinney's alleged LOTOTO violation were substantially different from those involved in Plaintiff's violation.  There, employees removed a barricade after a piece of equipment had completed its part of the work, and Mr. DeVinney, observing no barricades to define the LOTOTO work zone, stepped inside that area.[7] Mr. DeVinney was disciplined, through a demotion, for his LOTOTO violation but was not fired. In the Court's view, these circumstances differ in significant respects from those involved in Plaintiff's violation, and "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct," *Kendrick*, 220 F.3d at 1233.

---

[7] Defendants also suggest in their briefing that Mr. DeVinney self-reported his potential LOTOTO violation, which would be a significant distinction in comparing his violation with that of Plaintiff.  However, Defendants have presented no evidence to support such an assertion, so the Court may not consider it.

Consequently, any evidence related to the disparate discipline received by Mr. DeVinney for his LOTOTO violation is insufficient to raise a question of fact as to pretext.

With regard to Becky Garcia, Defendants have come forward with evidence indicating that, although she was initially terminated for an alleged LOTOTO violation, Ms. Garcia was ultimately reinstated upon further investigation of the circumstances surrounding her alleged violation. Evidence of Ms. Garcia's discipline is likewise insufficient to raise a question of fact as to pretext.

In addition to demonstrating the distinguishing circumstances of the discipline against Mr. DeVinney and Ms. Garcia, Defendants have also come forward with undisputed evidence that Richard Mohr, the general manager of the Tyrone Mill, who participated in the decision to terminate Plaintiff, also recommended the termination of Robert Milburn, *a Caucasian*, for a LOTOTO violation at the affiliated Chino mine.  Mr. Milburn was, in fact, terminated.  Moreover, Defendants present evidence that in April 2008, around the same time as the incident involving Plaintiff, Defendants disciplined but did not terminate Walter "Larry" Villines, a Hispanic supervisor, after an operator under his supervision moved a piece of equipment into an area that was about to be blasted with high explosives.

In summary, Plaintiff has failed to create a question of fact as to the sincerity of Defendants' proffered reason for his termination.  Instead, the evidence before the Court demonstrates that the proffered reason is in conformity with written company policy and company practice.  Accordingly, Plaintiff's failure to discredit Defendants' proffered reason for termination with evidence of pretext ultimately entitles Defendants to judgment as a matter of law.

## V.  CONCLUSION

The Court concludes that Plaintiff has failed to offer competent summary judgment evidence from which a reasonable fact-finder could determine that Defendants' proffered reason for his

termination was mere pretext for unlawful discrimination.  For this reason, Plaintiff's claim of national origin discrimination fails under the New Mexico Human Rights Act, and summary judgment in favor of Defendants is appropriate.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 49) is hereby **GRANTED**.

_____
SENIOR UNITED STATES DISTRICT JUDGE